Ford Hydro-Electric Company, Appellant, vs. Town of Aurora, Respondent.

*December 9, 1931—January 12, 1932.*

For the appellant there was a brief by *Schubring, Ryan, Clarke & Petersen* of Madison, and oral argument by *William Ryan.*

For the respondent there was a brief by *Sells & Sells* of Florence, and oral argument by *Arthur M. Sells.*

WICKHEM, J.   The plaintiff was organized on the 27th of August, 1923, as a private corporation with a capital stock of $25,000.   All of its stock is owned by the Ford Motor Company except three qualifying shares owned by Edsel B. Ford, Henry Ford, and B. J. Craig.   Prior to the organization of the plaintiff company the Ford Motor Company purchased a dam site and other lands for flowage purposes in the town of Aurora, bordering on the Menominee river and extending to the middle of this river.   At the same time the Ford Motor Company purchased a dam site and other lands for flowage purposes in Dickinson county, Michigan, across the river from the Wisconsin site.   After the organization of the plaintiff company the Ford Motor Company conveyed to it the dam site and flowage rights on the Wisconsin side of the river in return for the issuance of its stock to the Ford Motor Company.   It became necessary thereafter to acquire other lands for flowage purposes, and being unable to secure the necessary lands by negotiations, the plaintiff, in 1924, for the purpose of securing to itself the right of condemnation, amended its articles to include in its powers and purposes the "acquiring, owning, leasing, holding, and disposing of any lands, properties, water-power sites, water-power rights, and such transportation facilities within or without the state of Wisconsin," and "securing flowage rights and obtaining the necessary permits or licenses required in connection with or involving the objects herein contained; and the production, transmission, delivering, and furnishing of electric light, heat, and power directly or indirectly to and for the public, which said business is to be carried on within the state of Wisconsin, and especially within the county of Florence, in said state."   The power house and a portion of the dam site on the Michigan side of the Menominee river were leased to the plaintiff company from year to year by the Ford Motor Company.   The plaintiff company operates one power line extending from the power house in the state of Michigan to the Ford Motor

Company plant in the village of Kingsford, Michigan. The Ford Motor Company is the sole customer and consumes and uses all of the power generated by the plaintiff company, and pays therefor the actual cost of the generating of said power, which amounts to less than one cent per K. W. H., which cost is about half the average cost per K. W. H. in the community where the plant is located. The plaintiff company does not own, operate, or control any pole or transmission line in the state of Wisconsin, and furnishes no electric current for light, heat, and power in the state of Wisconsin. The plaintiff company has made no effort to obtain franchises for the erection of transmission lines or the distribution of electric energy in the community in which it is located, and has never made any effort to sell any electric energy generated at its plant except what is commonly known as dump power. The Ford Motor Company controls the policies, price of product, and delivery of product of the plaintiff company. There is an interlocking directorate existing between both companies—the same persons serving as officers of both companies; the accounts of the plaintiff company are kept by officers and employees of the Ford Motor Company, and the plant of the plaintiff company was built for the purpose of furnishing power to the Ford Motor Company at its Kingsford plant.

On the 24th of December, 1925, the Railroad Commission of Wisconsin issued to the plaintiff company a certificate of authority to issue certificates of stock, and thereafter the plaintiff made annual reports to the Railroad Commission but did not file with the commission a schedule of rates. None of its reports to the Tax Commission shows either profit or loss from the operation, and all of the correspondence between the Tax Commission and the plaintiff was written upon stationery of the Ford Motor Company.

From 1924 to 1929 the Tax Commission of Wisconsin valued the property of the plaintiff company and certified the

assessment to the respective town clerks and county clerks, in the same manner as public utilities are assessed and taxed. In 1929 the Wisconsin Tax Commission assessed the dam, dam site, and flowage rights of the plaintiff in the sum of $300,000, and computed and levied a tax upon the property at the average state rate, in accordance with sec. 76.15 of the Statutes. Prior to 1929 it was provided by statute that the assessment should be at the local rate. The local rate being higher than the average state rate, the officers of the town of Aurora, in 1929, assessed the property of the plaintiff company as personal property in the sum of $199,481, and thereafter levied the tax upon plaintiff company in the sum of $10,183.35. This tax was paid under protest, and the sole issue in this case is as to the validity of the tax.

The validity of the tax depends upon whether the plaintiff company falls within the provisions of sec. 76.02 (5) of the Statutes, which is as follows:

"Any person, association, company or corporation engaged in this state in any of the businesses enumerated in paragraphs (a) to (e) of this subsection, excepting only business enterprises carried on exclusively for the private use of the person, association, company or corporation engaged therein, whose property extends into two or more assessment districts shall be deemed a light, heat and power company.

"(a) . . .

"(b) . . .

"(c) Generating, transforming, transmitting or furnishing electric current for light, heat or power;

"(d) . . .

"(e) . . .

"The property, both real and personal, including all rights, franchises and privileges used in and necessary to the prosecution of the business of a light, heat and power company shall be deemed personal property for the purposes of taxation and shall be valued and assessed together as a single item. . . ."

.

It is the contention of the appellant that it is a light, heat, and power company within the meaning of sec. 76.02, since it is engaged in generating, transforming, transmitting, or furnishing electric current for light, heat, or power. It is contended that it is such a company whether it furnishes this service for the public or not. This raises the initial question as to whether sec. 76.02 is meant to be applied to every company engaged in the business of furnishing light, heat, or power, or whether it is limited in its application to public utilities. It is considered that the latter conclusion must be accepted as sound.

Ch. 76 is entitled "Taxation of Public Utilities and Insurance Companies." The whole context of the chapter indicates that its application is intended to be limited to public utilities. Hence it must be determined whether plaintiff company is a public utility. The first contention of the appellant is that the purpose clause of its articles unequivocally makes it a public utility. Citation is made to *In re De Peyster's Estate,* 210 N. Y. 216, 104 N. E. 714, in which the court there said:

"It was quite unnecessary in this case for the purpose of construing the act of incorporation to inquire what had been done under it by its incorporators. Its purpose, as expressed, needs no explanation or interpretation."

The conclusion in that case was that "the purpose of the corporation as stated in the act of incorporation and its by-laws is clear and unambiguous" and is final and conclusive. But in that case the object of inquiry was the corporate purpose. It was held that evidence that the corporation had gone beyond its powers was not admissible to show that it was organized for purposes other than those stated in the purpose clause.

The powers and purposes of a corporation are one thing, and whether it is a public utility is quite a different thing.

It is a matter of common knowledge that corporations, in order to avoid questions of *ultra vires* or any undue limitation upon the powers of their officers to conduct the business expeditiously and profitably, have extended their purpose clauses to include activities of all sorts. To say that a corporation engaged in the manufacture of automobiles, for example, by introducing into its power and purpose clause the right to furnish power as a public utility, inevitably stamps the corporation so organized as a public utility is unsound. It is more accurate to say that such a corporation has the capacity or power to operate as a public utility, and that whether or not it is a public utility must depend upon further acts on its part. It is not to be denied that the fact that it states as one of its purposes the conduct of a public utility may give color to its later acts, and, in connection with them, lead to the conclusion that it is a public utility. Standing alone, however, such a provision is not determinative. In *Terminal Taxicab Co. v. District of Columbia*, 241 U. S. 252, 36 Sup. Ct. 583, the court, speaking through Mr. Justice HOLMES, said:

"The plaintiff is a Virginia corporation authorized by its charter, with copious verbiage, to build, buy, sell, let and operate automobiles, taxicabs, and other vehicles, and to carry passengers and goods by such vehicles; but not to exercise any of the powers of a public service corporation. It does business in the District, and the important thing is what it does, not what its charter says."

The court then proceeds to hold that in certain of its activities it is a common carrier subject to the jurisdiction of the public utility commission.

In *State ex rel. M. O. Danciger & Co. v. Public Service Comm.* 275 Mo. 483, 205 S. W. 36, it is said:

"In determining whether a corporation is or is not a public utility, the important thing is not what its charter says it may do, but what it actually does. In short, if the things

done constitute the corporation a public service company, it ought not to be, and will not be, heard to urge its own wrongful aggressions in order to escape regulation."

It is next contended that the mere fact that a plant has only one customer or a few customers does not prevent it from being a public utility, provided the plant is built and operated for furnishing power to the public generally. To this proposition *Cawker v. Meyer,* 147 Wis. 320, 133 N. W. 157, is cited. In that case it appeared that the plaintiffs had built a plant for the purpose of furnishing the tenants of their own building with heat, light, and power; that the completed plant proved to be large enough, when economically run, to furnish more heat, light, and power than the tenants of their own building required, and that they sold the surplus to three of their adjoining neighbors. The court held that the plaintiffs did not thereby become a public utility. "It was not the furnishing of heat, light, or power to tenants, or, incidentally, to a few neighbors that the legislature sought to regulate, but the furnishing of those commodities to the public, that is, to whoever might require the same." The court says: "The use to which the plant, equipment, or some portion thereof is put must be for the public in order to constitute it a public utility." It is stated, however, that "whether or not the use is for the public does not necessarily depend upon the number of consumers; for there may be only one, and yet the use be for the public—as where a plant is built and operated for furnishing power to the public generally, but for a time finds one consumer who uses it all. If the product of the plant is intended for and open to the use of all the members of the public who may require it, to the extent of its capacity, the fact that only one or two thereof consume the entire product renders the plant none the less a public utility."

This case furnishes the test to be applied in ascertaining whether plaintiff was a public utility. The fact that it serves

a single customer is not determinative. The question is whether the plant is built and operated to furnish power to the public generally. If it is, then the fact that it has presently only a single customer will not prevent it from being a public utility. An application of this test makes it clear that plaintiff is not a public utility. The record discloses that it was organized solely for the purpose of furnishing power to the Ford Motor Company, which owned all of its stock and as to which it was a subsidiary. Its plant was not built or operated for furnishing power to the public generally. The fact that it has only one customer is not an accidental or a temporary condition. Only one customer was ever intended, and the change to a public utility form of organization was for the sole purpose of acquiring the right to condemnation. The company has not one foot of transmission line in this state; has made no effort to sell power in this state; has no facilities; has no franchises, and sought no franchises during the period before the surrounding country was pre-empted by other utilities. It has filed no schedule of rates. Upon the whole record it must be concluded that there was no intention on the part of the plaintiff to operate its plant for the furnishing of power to the public generally, and that whatever may be its potentialities, it is not presently a public utility under the rule laid down in the case of *Cawker v. Meyer,* cited *supra.*

It is also contended that the mere fact that as yet no public services have been performed does not militate against the conclusion that plaintiff is a public utility company. In *Kilbourn City v. Southern Wis. Power Co.* 149 Wis. 168, 135 N. W. 499, it was held that it is not necessary that service by such corporation shall actually begin before its duties and liabilities as such arise or are imposed. Otherwise, it is pointed out, it might contract prior to actual service to evade the law as to uniformity of rates. This case is cited with approval in *Wisconsin T., L., H. & P. Co. v.*

*Green Bay & M. C. Co.* 188 Wis. 54, 205 N. W. 551. However, these cases involved companies which undoubtedly had the purpose to become public utilities. It was held that such a company must be treated as a public utility during the period prior to the completion of its plant for the furnishing of service. As has heretofore been pointed out, plaintiff at no time occupied such a position or had such a purpose.

It is further contended that the plaintiff, by entering the field of furnishing and selling water power created by a dam upon a navigable stream, dedicated such water power to the public use and thereby became a public utility. In *In re Southern Wis. Power Co.* 140 Wis. 245, 122 N. W. 801, the court said:

"Where a dam is constructed in a navigable stream in aid of navigation, the purpose of its construction is public, and also that the taking of property for the generation of electric power for the purpose of sale is a taking of property for a public purpose."

See, also, *Wisconsin T., L., H. & P. Co. v. Green Bay & M. C. Co.,* cited *supra; Wisconsin River Imp. Co. v. Pier,* 137 Wis. 325, 118 N. W. 857.

Citation is also made to sec. 31.27, Stats., which provides that "upon complaint by any party affected, setting forth that any grantee of a permit to develop hydraulic power and generate hydro-electric energy for sale or service to the public is not furnishing citizens of this state with adequate service at a reasonable rate in consequence of sales of such energy outside of the state, the commission shall have power to declare any or all contracts entered into by said grantee for such sales null and void in so far as they interfere with such service or rate."

While this contention may lead to the conclusion that a user of water power may be compelled to enter the public utility field and to furnish power at reasonable rates to citi-

zens of Wisconsin, we think the mere fact that a dam was constructed on a navigable stream for the purpose of generating power does not of itself compel the conclusion that the producer of such power is a public utility.

An examination of the provisions of sub. (5), sec. 76.02, fortifies the conclusion heretofore reached. That subdivision provides: "Any person, association, company or corporation engaged *in this state* in . . . (c) generating, transforming, transmitting or furnishing electric current for light, heat or power." The plaintiff is engaged in none of these businesses in this state, in the sense that it is furnishing light, heat, and power to the residents of Wisconsin, or maintaining any facilities for that purpose. It is extremely unlikely that the legislature intended to tax as a utility a light, heat, and power company which did not serve a single Wisconsin customer, and in whose rates and service the people of Wisconsin had not the slightest present interest. Further than this, sub. (5) exempts from its operation business enterprises carried on exclusively for the private use of the person, association, company, or corporation engaged therein. While, literally speaking, the plaintiff company is as distinct from the Ford Company as one person is from another, and while technically it occupies the position of a vendor of power to the Ford Company, it must be considered, if we are permitted to look to the substance rather than to the form, that the plaintiff company is the Ford Motor Company and is operated solely for its use and benefit. The facts supporting this conclusion have heretofore been set out, and it is unnecessary to repeat them. It is contended by the plaintiff that any attempt to identify the plaintiff with the Ford Motor Company constitutes a collateral attack upon the corporate franchise of the plaintiff. We think this is not sound. No claim is made that the plaintiff has not the power to become a public utility. It is simply

contended that it has not exercised such a power, and that it has not in fact entered the public utility field. Nor is it claimed that the plaintiff is not an independent corporation, wholly separate in legal contemplation from the Ford Motor Company. Nor is it asserted that the plaintiff company has used its corporate organization as a device to evade taxation. It is simply contended that there is such an identity of interest between the plaintiff and the Ford Motor Company as to bring plaintiff within the exception to sub. (5), sec. 76.02. This contention we regard as sound.

. In *Miller v. Wis. Tax Comm.* 195 Wis. 219, 221, 217 N. W. 568, the plaintiff organized a corporation and transferred his property to this corporation, in return for a transfer of its stock to him. The question was whether he had thereby made a sale of his property in such a way as to subject him to an income tax, and it was held that he had not; that the court might look to the substance of the transaction, and that by reason of the transaction his interest in the property was simply evidenced by a different muniment of title. His interest in and control over the property remained the same. It was concluded that there had been no sale which could be made the basis of an income tax. The reasoning of this case applies to the present situation.

It is our conclusion that plaintiff was subject to local taxation: first, because it is not presently a public utility; second, because it is not engaged in this state in the light, heat, and power business; and third, because there is such an identity between the Ford Motor Company and the plaintiff as to lead to the conclusion that in substance the two corporations are the same, and that the business of the plaintiff is carried on exclusively for the benefit of itself, within the meaning of sub. (5), sec. 76.02.

The final question is whether the assessment was void because of the fact that the tax levied by the town was er-

roneously levied as a tax upon personal property instead of a tax upon real estate. Defendant claims, and the court found, that the only question submitted to the trial court was whether sec. 76.02 applied to plaintiff. Defendant further states in his brief that at the commencement of the trial of this case it was stated by both counsel, in the presence of the court, that the only question involved was the power of the local taxing officials to levy any tax upon the plaintiff, and that if it should be determined that the local officials did have such power, an adjustment would be made between the parties as to the form of taxation. The record does not disclose the making of such statements. Defendant further states that the disposition of this contention is of relatively little importance to it. Plaintiff contends that the question was raised before the trial court, and this claim seems to be substantiated by the fact that plaintiff's proposed findings contain a request to the court to find that plaintiff owned no personal property in the town of Aurora, and that all of its property in that town was real estate. There appears to be no question but that the plaintiff's holdings in the town of Aurora are entirely composed of real estate, and that the levy of a personal tax upon such real estate is wholly void. *Langlade v. Crocker Chair Co.* 190 Wis. 226, 208 N. W. 799.

For this reason the judgment of the trial court must be reversed.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment in accordance with the demand of the complaint.